Filed 6/28/22 In re P.E. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION ONE

| | |
|---|---|
| In re P.E. et al., Persons Coming Under the Juvenile Court Law. | B315595 (Los Angeles County Super. Ct. No. DK23203; 19CCJP04680) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. I.D. et al., Defendants and Appellants, | |

APPEAL from an order terminating parental rights of the Superior Court of Los Angeles County, Jean M. Nelson, Judge. Affirmed.

Law Offices of Vincent W. Davis and Vincent W. Davis for Defendant and Appellant Ianna D.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant Pr.E.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel for Plaintiff and Respondent.

———————————

This dependency case commenced five years ago following incidents of domestic violence. The current appeal involves the termination of mother's and father's parental rights over their daughter P.E. (born in August 2015), and son K.E. (born in May 2018), who have been living together with their prospective adoptive parents since July 2019. Both mother and father argue that we should reverse the termination of their parental rights because the Los Angeles County Department of Children and Family Services (DCFS) failed to interview their extended family members about Indian ancestry. We reject the argument because the error was not prejudicial.

We also reject mother's argument that the juvenile court erred in terminating her parental rights because the parental-benefit exception to adoption applies. Substantial evidence supports the juvenile court's finding that mother did not consistently visit the children, an essential element of the parental-benefit exception. (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).) We affirm the orders terminating mother's and father's parental rights over P.E. and K.E.

2

# BACKGROUND[1]

Prior to the current dependency proceedings, DCFS received two referrals involving mother and father. In May 2016, someone reported that father verbally abused mother and staff in a doctor's office. Mother acknowledged that "the father constantly yells and screams in the presence of" P.E. but denied any physical abuse. In June 2016, a neighbor reported that mother had a swollen eye and mother's lip was bleeding. Mother explained that "she was walking backwards and fell forward and injured herself."

In June 2017, at the commencement of the current dependency proceedings, P.E. was 21 months old. K.E. was born in May 2018, during the dependency proceedings.

The current dependency proceedings commenced when maternal grandmother reported that mother and father have a history of domestic violence and mother returned home with either one or two black eyes. Maternal grandmother also reported that she had a restraining order against father.

A text message on mother's phone stated: "U the one who s[a]t on [P.E.] while. CHocking me and u said udc both of us can die." In another message mother wrote father, "Ur sisters ur mom ur dad my parents my job [P.E.] herself seen how uve physically and mentally abused me." DCFS reported that the domestic violence injured mother causing a "contusion to her right eye." When asked by social workers, mother denied domestic violence, stating that father accidently hit her with his

---

[1] We summarize only those facts relevant to the issues on appeal.

elbow. Mother admitted she left father 10 times, and each time returned to their relationship.

Father participated minimally in the dependency proceedings. On February 11, 2018, an unidentified person shot father in the head. After the shooting, DCFS had difficulty locating father. In August 2019, father reported he was homeless. DCFS reported that, in May 2020, father sent the children's prospective adoptive parents threatening messages. In September 2020, father was arrested for criminal threats and assault with a firearm. Father was incarcerated on November 16, 2020 for an unspecified crime. Following his incarceration, father told the social worker that he would not participate in any future dependency court proceedings.[2] In July 2021, father was transferred from prison to a court-ordered drug treatment program.

### 1. *Petitions and mother's case plan*

The initial Welfare and Institutions Code[3] section 300 petition identifying P.E. as a child within the jurisdiction of the juvenile court, as later sustained, provided: Mother and father have a history of engaging in violent altercations in P.E.'s

---

[2] Father has a criminal history dating back to 2010, when he was convicted of remaining on posted property (property posted against trespassing and loitering) in violation of Penal Code section 555. Father also was convicted of reckless driving (2012) and of driving with a suspended license (2012 and 2014). Although father has numerous other arrests, including for battery on a spouse or ex-spouse, the record does not identify any additional convictions.

[3] Undesignated statutory citations are to the Welfare and Institutions Code.

4

presence. Father struck mother's eye with his elbow, bruising her eye. Mother allowed father to have unlimited contact with P.E. Father's violent conduct towards mother and mother's failure to protect P.E. places P.E. at risk of harm.

On July 24, 2019, DCFS filed a petition identifying K.E., who was then 14 months old, as a child who comes within the jurisdiction of the juvenile court. The petition alleged that mother and father have a history of engaging in violent altercations in P.E.'s presence. Father bruised mother's eye, and mother failed to protect P.E. Father's conduct and mother's failure to protect placed K.E. at risk of harm. The juvenile court sustained the petition.

On September 23, 2019, the juvenile court sustained a supplemental petition with respect to P.E. alleging that mother failed to participate in a domestic violence support group and individual counseling as ordered by the juvenile court and mother's failure to comply with those orders endangered the children's health.

Mother's initial case plan required mother to attend domestic violence classes and parenting classes. In April 2018, the juvenile court ordered mother to participate in counseling.

2. *Mother's conduct during the dependency period*

In January 2018, mother lived with maternal grandmother. DCFS reported that mother enrolled in court ordered services, but only attended one class and otherwise has not complied with court orders. Mother reported she had no contact with father. As previously noted, K.E. was born in May 2018.

In April 2018, DCFS reported that mother completed her parenting class. Mother was attending domestic violence classes.

5

Mother stopped and restarted her domestic violence classes multiple times throughout the dependency period.

In May 2019, DCFS reported that father and mother were together in the laundry room in mother's apartment complex. Mother acknowledged that father visited the family home in March and May 2019. She denied being in a relationship with father.

In September 2019, a social worker interviewed mother who stated that she went to some, but not all of her domestic violence classes and that she was on a wait list for individual counseling. Mother stated that she was not in a relationship with father. The director of the counseling center where mother was attending programs indicated that mother had not participated in classes for a year. Mother did not return calls from the counseling center regarding individual counseling. DCFS was concerned that P.E. reported she and K.E. sometimes stayed with mother and father in a hotel. DCFS indicated mother "minimizes the risk to herself and her children."

In November 2019, DCFS reported that mother had attended two domestic violence classes since July of that year. Mother recently applied for individual counseling but had not yet received her counselor assignment. P.E. also represented that mother and father spent time together with the children. P.E. also reported that mother and father hit both children. P.E. told her prospective adoptive parents that father hit mother on mother's back and hurt mother. On a second occasion, P.E. reported that mother and father hit her.

On November 4, 2019, the court ordered no further reunification services for mother with respect to P.E.

In May 2020, DCFS reported that mother had stopped communicating with social workers. Social workers' review of social media sites indicated that mother and father were spending time together. DCFS concluded that the children were at risk of harm from mother and father's ongoing relationship.

In September 2020, DCFS reported mother still was not communicating with social workers. In February 2021, DCFS stated mother sporadically spoke to the social worker but had not completed her case plan.

On December 2, 2020, the juvenile court terminated mother's reunification services with respect to K.E.

3. *Mother's visits*

In July 2017, DCFS reported that paternal aunt S.E. monitors mother's visits and mother was appropriate and visited " 'as frequently as possible.' " In July 2017, DCFS reported P.E. was affectionate with mother, and mother was attuned to P.E.'s needs.

In January 2018, DCFS reported that P.E. "has a loving and caring relationship with her parents during visits . . . ." She "runs to her parents very excited to see them and she hugs and kisses them." Mother visited twice a week for two to three hours. P.E. appeared to be bonded to mother and was excited to see mother. In February 2018, DCFS reported that mother consistently visited two times a week.

In April 2018, the juvenile court returned P.E. to mother's custody.

In July 2019, DCFS sought a removal order. The court detained the children and ordered monitored visits for mother, but did not specify the number of visits. DCFS indicated that

7

mother had two or three visits a week for two to three hours per visit.

On August 18, 2019, mother arrived an hour late to her visit. K.E. appeared happy to see mother. Mother was "loving and affectionate" with the children throughout the visit.

At the beginning of September 2019, DCFS reported that mother was permitted two or three visits a week. On September 5, 2019, mother missed her visit. DCFS reported that mother's visits with the children were located in DCFS offices and she often arrived between 30 and 90 minutes late. P.E. was upset when mother failed to show up for a visit and when her visits with mother ended. During her visits, mother was attentive to the children.

In November 2019, DCFS reported that mother was inconsistent with visits and frequently arrived late to her scheduled visits. When mother visited, she was attentive and engaged both children.

In May 2020, DCFS reported that mother visited consistently twice a week but consistently arrived late. On one occasion, mother told P.E. that the detention was all her fault and P.E. started to cry inconsolably. P.E.'s therapist later disclosed that P.E. blames herself for the detention.

In September 2020, DCFS reported that mother's visits were "sporadic." Mother visited three times between May 10, 2020 and June 5, 2020. When she visited, she was usually late and brought friends with her. P.E. told mother she missed her. When asked by the foster parent, mother offered no explanation why she had not visited the children in a month.

Mother visited seven times in October 2020 and six times in November.[4] The last time she brought a friend with her. She visited five times in December 2020 (including three in-person and two FaceTime calls) and four times in January 2021.

In February 2021, DCFS reported that mother visited "fairly regularly." Mother was visiting once a week with a social worker monitoring her visits. Although the foster parents allowed mother to visit on weekends, she frequently chose not to visit on the weekends. In April 2021, DCFS reported that mother started scheduling weekend visits with the foster parents and visited weekly on Tuesdays. Also in April 2021, DCFS reported that "mother appears to have difficulty in engaging with both children and often tells [P.E. ,] 'Your little brother needs me.' " DCFS reported that mother visited more consistently since father was incarcerated.

In July 2021, DCFS expressed concern that mother routinely told the children that she was preparing their rooms because she was regaining custody of them. Mother stopped discussing custody with the children when social workers threatened to stop her visits if those discussions continued.

4. ***DCFS report in advance of the section 366.26 permanent placement hearing***

With respect to P.E. in advance of the permanency planning hearing, DCFS stated that the prospective adoptive parents were able to meet all of P.E.'s needs. They treat her as family and she "made a smooth transition into the home" where she had been living for over a year. Since October 2020, mother

---

[4] Mother kept a log of her visits and indicates she visited five times in November 2020.

"made a greater effort to visit" P.E.  DCFS reported that mother visited once in January 2021, six times in February 2021, six times in March 2021, and five times in April 2021.

Mother had not reported attending any additional programs.  In a last minute information for the court, DCFS reported that mother continued to visit on Tuesdays and sometimes scheduled visits on the weekends.

In the section 366.26 report for K.E., DCFS indicated that K.E. has been in the foster home for almost two years and is treated as a family member.  DCFS stated that mother had difficulty engaging both children during visits and often focused on K.E.[5]

5. *The children's placements*

Initially, P.E. was placed with paternal aunt S.E.  Although P.E. initially was sad and confused when she was removed from mother's custody, P.E. adjusted well to her aunt's home.  P.E. "appeared securely attached to her aunt and they appeared to have a loving relationship."

In April 2018, P.E. was returned to mother's custody.  She lived with mother and her then newborn brother K.E.  While mother had custody of the children, she lived sometimes with paternal aunt S.E. and sometimes with maternal grandmother.  During the time mother had custody of the children and lived with maternal grandmother, the Los Angeles Police Department

---

[5] In a last minute information for the court in advance of a September 15, 2021 hearing, DCFS indicated that although P.E. thought she saw father with mother at a visit, mother explained it was not father but her boyfriend.

responded to several calls at maternal grandmother's residence. Twice father was present.

In July 2019, P.E. and K.E. started living with their prospective adoptive parents. DCFS reported that the prospective adoptive parents "love and care for" K.E. and P.E. and that K.E. developed a strong attachment to them. In February 2021, DCFS reported the prospective adoptive parents were loving and attentive. P.E. "has developed a strong attachment and emotional bond with her current caregivers."

## 6. *Mother's requests for a bonding study*

Mother filed motions requesting the juvenile court appoint an expert to evaluate her bond with P.E. and a separate motion requesting the court appoint an expert to assess her bond with K.E. In both motions mother argued that she could establish the parental-benefit exception to termination of parental rights.

In support of her request for a bonding study, mother attached a log describing her visits. According to her, she visited once in June 2020, five times in July 2020, five times in August 2020, four times in September 2020, six times in October 2020, five times in November 2020, five times in December 2020, four times in January 2021, twice in February 2021, three times in March 2021, and twice in April 2021. Mother stated the children were happy to spend time with her. According to mother, the children wanted the visits to last longer, the children told her how much they loved her, and she "showered them with love and affection . . . ." Mother indicated, "They look forward to seeing me again, both of my children always ask me when I'm going to see them again. I assure them, mommy will always be here and I will always spend time with my babies."

11

At a hearing in July 2021 to assess mother's request for a bonding study, DCFS represented that since October 2020, mother visited once a week with some additional phone calls. The children's counsel represented that prior to October 2020, mother "was not consistent, and there were substantial periods of time that she did not see [P.E.] or even have contact with [P.E.] or the Department for quite some time." Counsel for the Department added that mother often brought other people to the visits "which distract from the visits, especially given the fact that it's only two hours." Mother's counsel argued that although mother had only one in-person weekly visit, mother had additional video visits with the children. Mother's counsel requested a bonding study, which the juvenile court denied.

The court explained its reasoning for denying the bonding study as follows: "Mother is just having weekly visits with some electronic visits that are nice visits. But it's the usual loving bond we see between a parent and child, but it doesn't go beyond anything than just these weekly fun visits that are fun for the children." The court stated, "[A]lthough mother is consistent now, she went through a long period of not being consistent, going for . . . almost a whole month this time last year without seeing the child in person . . . ."

7.    *Hearing and permanent placement orders*

No witness testified at the hearing to determine the children's permanent placement. The children's counsel argued that the court should terminate parental rights. Counsel argued, "The children need permanency at this point and there are no exceptions to adoption that apply, so I'm asking the court to terminate parental rights today." Mother's counsel objected to the termination of parental rights but did not specifically argue

the parental-benefit exception. Father's counsel objected to the termination of parental rights based on mother's bond with the children. The court allowed mother to address the court and mother indicated she was "a really good mom" and had a strong bond with her children.

The juvenile court found mother did not maintain regular visitation with P.E. or K.E. and had not established a bond with them. The court stated, "For a long period of time, they [mother's visits] were sporadic." The court found that any benefit accruing by continuing the relationship with mother is outweighed by the permanency of adoption.

The court terminated mother's and father's parental rights over P.E. and K.E.

## DISCUSSION

We first discuss mother's and father's arguments that social workers erred in failing to interview mother's and father's extended family members about Indian ancestry. We then turn to mother's argument that the juvenile court should not have terminated parental rights because the parental-benefit exception precluded such termination.

### A. The Error in Failing to Interview Extended Family Members about Indian Ancestry Was Not Prejudicial

" 'Congress enacted ICWA [Indian Child Welfare Act of 1978; 25 U.S.C. § 1901 et seq.]) to further the federal policy " 'that, where possible, an Indian child should remain in the Indian community . . . .' " [Citation.]' [Citation.] [¶] ICWA imposes notice requirements that are, at their heart, as much about effectuating the rights of Indian tribes as they are about the rights of the litigants already in a dependency case. The

13

purpose of ICWA notice requirements is to enable 'a determination' of whether the child is an Indian child, such that an Indian tribe can exercise its ability to intervene in the proceeding (or assume jurisdiction) if so. [Citation.] ICWA thus requires notice to Indian tribes 'in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights "where the court knows or has reason to know that an Indian child is involved." ' [Citations.]" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 740–741 (*Benjamin M.*).) "Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*Id.* at p. 741.)

Mother and father argue that DCFS failed to discharge its duty of initial inquiry of the children's Indian ancestry. More specifically, they argue social workers should have interviewed extended family members about the children's potential Indian ancestry. Mother and father argue this error was prejudicial because "there were multiple family members, both paternal and maternal, with whom DCFS had contact on a regular basis and throughout the life of the case. No inquiry was done of any of the relatives or extended family members with the exception of the trial court's inquiry of [paternal aunt] at the very first hearing for P.E." We first provide additional background and then turn to parents' arguments.

### 1. Background

DCFS reported, and it is undisputed that P.E. is of Filipino and Nigerian descent. It also is undisputed that P.E. and K.E. share the same parents. Mother reported that she was born in the Philippines and has an older half brother. Mother moved to

14

the United States in 2007. Maternal grandmother reported that mother moved to the United States when she was 13 and before that, the family lived in the Philippines. Maternal grandfather abandoned the family while they still lived in the Philippines. Maternal grandmother remarried and lived with stepmaternal grandfather.

On June 5, 2017, a social worker asked mother about Indian ancestry and based on mother's responses, which are not documented, concluded that ICWA does not apply.

On June 7, 2017, mother completed a parental notification of Indian status form indicating, "I have no Indian ancestry as far as I know."

On June 7, 2017, at the detention hearing, the juvenile court asked paternal aunt S.E. if father had any American Indian ancestry. Paternal aunt answered negatively. The court indicated mother's ICWA form showed she had no Indian ancestry as far as she knew. The court told mother if she learned anything indicated they may have Indian ancestry to inform the court.

On January 18, 2018, father filed a parental notification of Indian status form indicating, "I have no Indian ancestry as far as I know." The court found no ICWA as to father.

On July 24, 2019, the social worker completed an Indian child inquiry attachment form indicating that she made an inquiry as to K.E. and he had no known Indian ancestry. The form indicates the social worker spoke to both maternal grandmother and to paternal grandfather.

Mother filed another parental notification of Indian status on July 25, 2019 indicating, "I have no Indian ancestry as far as I know."

15

During the course of the dependency proceedings, social workers spoke to paternal grandmother, two paternal aunts (including S.E.), and a paternal uncle. There is no indication that social workers asked these extended family members about mother's or father's Indian heritage.

### 2. The error in failing to interview extended family members was not prejudicial

DCFS erred in failing to interview extended family members about Indian descent. (*In re Darian R.* (2022) 75 Cal.App.5th 502, 507 (*Darian R.*); § 224.2, subd. (b)[6].) It is undisputed that social workers interacted with several extended family members without inquiring as to possible Indian ancestry. Specifically, social workers did not contact mother's half brother, and did not question paternal aunts, a paternal uncle, or paternal grandmother about Indian ancestry. Respondent does not challenge the assertion that social workers should have asked these extended family members about Indian ancestry. The remaining question is whether the error—a violation of state law—was prejudicial. (*Benjamin M.*, *supra*, 70 Cal.App.5th at

---

[6] Section 224.2, subdivision (b) provides: "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."

p. 742 [error in completing initial duty of inquiry involves only state law].)

*Benjamin M.* explains that in the context of the failure to conduct an initial ICWA inquiry, prejudice results "where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) *Benjamin M.* further held: "Under this approach, we required continued inquiry where the probability of obtaining meaningful information is reasonable in the context of ICWA." (*Ibid.*)

Applying that test, the *Benjamin M.* court found prejudice where Benjamin's father did not participate in the proceedings. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 740.) Social workers spoke to father's brother but did not ask him whether he had Indian ancestry. (*Ibid.*) Further, it was unclear whether the mother could contact the father to ask father about his Indian ancestry. (*Id.* at p. 743, fn. 5.) Ultimately, the appellate court concluded that father's brother's knowledge of his Indian status would be suggestive of father's status and if interviewed "his answer is likely to bear meaningfully on the determination at issue about his brother." (*Id.* at p. 745.)

Although other courts apply different tests to evaluate prejudice,[7] this court has followed *Benjamin M.* because it

---

[7] Courts have adopted different approaches to assess prejudice when social workers fail in their initial duty of inquiry to interview extended family members about Indian descent. (See *In re A.R.* (2022) 77 Cal.App.5th 197, 207 ["a rule requiring reversal in all cases where ICWA requirements have been

17

reconciles the state harmless error rule requiring a showing of prejudice for reversal with the state statutory scheme requiring social services agencies to gather information. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 742–744.) A rule that requires reversal of a juvenile court's order in all cases in which the agency failed to interview all extended family members is inconsistent with the state harmless error rule. (*Id.* at p. 743.) A rule that requires a parent demonstrate he or she has Indian ancestry to demonstrate prejudice is inconsistent with the requirement that the agency investigate because it "would effectively impose a duty on that parent to search for evidence that the Legislature has imposed on only the agency." (*Ibid.*; see also *In re A.C.* (2022) 75 Cal.App.5th 1009, 1011 [rejecting rule that would require finding of no prejudice unless the parent "makes a proffer that interviewing extended family members would yield information about potential Indian ancestry"].)

Following *Benjamin M.*, in *Darian R.*, we rejected mother's argument that the failure to ask maternal aunt and maternal

---

ignored is consistent with the recognition that parents are effectively acting as 'surrogate[s]' for the interests of Native American tribes when raising this issue on appeal"]; *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435 [where DCFS fails to discharge initial duty of inquiry "the error is in most circumstances" prejudicial]; *In re J.C.* (2022) 77 Cal.App.5th 70, 80 [where "Department's failure to conduct an adequate inquiry makes it impossible for the parent to show prejudice, we must remand for a proper inquiry"]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 ["[O]n this record, which demonstrates that the Department failed to discharge its first-step inquiry duty, we conclude that mother's claim of ICWA error was prejudicial and reversible."].)

18

grandfather about Indian ancestry was prejudicial. (*Darian R.*, *supra*, 75 Cal.App.5th at pp. 509–510.) In contrast to *Benjamin M.,* the mother in *Darian R.* was not challenging the failure to interview a family member she did not know, but was challenging the failure to interview family members she knew and lived with over the course of the dependency proceedings. (*Id*. at p. 510.) Also, the juvenile court had made a prior finding that ICWA did not apply to two of the three children, and it was undisputed all three children shared the same ancestry. (*Ibid*.) Additionally, the mother was under court order since 2019 to continue to provide relevant information concerning ICWA and provided no such information even though she communicated with and lived with her extended family. (*Ibid*.)

Similarly, in *In re S.S.* (2022) 75 Cal.App.5th 575, 582*,* we found no prejudice where social workers failed to interview maternal grandmother when the maternal grandmother had an incentive to reveal Indian ancestry during her participation in the dependency proceedings when she sought custody of her granddaughter. Also applying the *Benjamin M.* test, we found prejudice in *In re A.C.*, *supra*, 75 Cal.App.5th 1009, where DCFS interviewed no extended family members and the juvenile court relied exclusively on the parents' ICWA forms. (*Id*. at p. 1017.) We explained: The failure to conduct *"any* inquiry" of extended family members was prejudicial where mother may not know her biological relatives and the detention report indicated that the child may be an Indian child. (*Id*. at p. 1016.)

Turning to this case, "it was obvious that additional information would not have been meaningful to the inquiry." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743.) With respect to mother, she participated in the proceedings and denied having

19

Indian ancestry. The parents were of Filipino or Nigerian descent. Social workers also interviewed maternal grandmother who confirmed that the family did not have Indian ancestry. Together, mother and maternal grandmother's consistent denials of Indian ancestry provides a reliable basis for the juvenile court to conclude that the children did not have Indian ancestry on their maternal side. Mother's and father's argument that social workers also should have interviewed maternal step grandfather, with whom they had regular contact, is not persuasive because he does not fall within the definition of extended family under ICWA. "Under ICWA, the term 'extended family member' is 'defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent.' [Citation.]" (*Darian R.*, *supra*, 75 Cal.App.5th at p. 507.)

It is speculative to assert that interviewing additional paternal relatives would have yielded meaningful information. Father, paternal aunt S.E., and paternal grandfather all denied the family had Indian ancestry. Father filed a form denying any Indian ancestry. Father's sister, who was present at the detention hearing, denied any Indian ancestry when the juvenile court inquired. Paternal grandfather also denied Indian ancestry when a social worker questioned him. Although father stated that his denial of Indian ancestry concerned only P.E., it is undisputed that K.E. shared the same parents and therefore the same ancestry.

Thus, with respect to both parents, the record shows that mother, father, and their extended family members all denied

20

Indian ancestry. In finding that ICWA did not apply, the juvenile court had substantially more information available than in *In re A.C.* where the court relied exclusively on the forms the parents had completed and there was a reference to Indian ancestry in one of the detention reports. Even though social workers should have interviewed additional extended family members with whom they had contact, the record does not show that interviewing them would have yielded meaningful information about Indian ancestry.

### B. Substantial Evidence Supports the Juvenile Court's Determination that the Parental-Benefit Exception Does Not Apply

The juvenile court found that the parental-benefit exception to the termination of parental rights did not apply. Among other reasons, the juvenile court concluded that for "a long period of time, [mother's visits] were sporadic." Mother argues that the juvenile court should not have terminated parental rights because the parental-benefit exception precludes such termination.[8] On appeal, mother describes her visits as "fairly regular" and argues that the children are deeply bonded to her.

---

[8] The issue is not forfeited, as respondent argues. Mother raised the parental-benefit exception in the context of her request for a bonding study, father raised it at the section 366.26 hearing, and the juvenile court expressly considered it prior to terminating mother's parental rights. This is not a case where the issue is raised for the first time on appeal as respondent asserts.

In *Caden C., supra,* 11 Cal.5th 614, our Supreme Court recently considered the parental-benefit exception to the termination of parental rights. A parent must prove three elements to establish this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at p. 631, italics omitted.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Id.* at p. 632.) *Caden C.* instructs that we review the juvenile courts finding on this element of the exception for substantial evidence. (*Id.* at p. 639.)

Substantial evidence supported the juvenile court's conclusion that mother's visits were sporadic. After social workers removed P.E. from mother's custody a second time and also removed K.E. from mother's custody, mother stopped communicating with social workers and visited the children only sporadically. Beginning in September 2019, mother started missing visits and arriving late to those visits she attended. P.E. noticed mother's inconsistency, and even told mother she missed the visits. In September 2020, DCFS described mother's visits as "sporadic." When asked by the foster parent, mother offered no explanation why she had not visited the children in a month. Mother also never explained why she brought friends to her visits instead of directing all her attention to her children.

In February 2021, DCFS reported that mother visited "fairly regularly." Mother was visiting once a week with a social worker monitoring her visits. Yet, mother did not maximize the time allowed as she frequently chose not to visit on the weekends.

According to mother's own visitation log she did not take advantage of all of the visitation offered to her.[9]  Even if mother's description of her visits as "fairly regular" is correct, the statute requires "regular visitation" as the first prerequisite to showing the parental-benefit exception to the termination of parental rights.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

Because substantial evidence supported the juvenile court's finding on the first element of the parental-benefit exception, we need not consider the remaining elements.  Mother and father each argue that if this court reverses as to one it must reverse as to the other.  This argument is moot as neither party has demonstrated that the juvenile court erred in terminating parental rights.  Mother seeks to join in any argument by father that inures to her benefit but father made no argument inuring to her benefit.

---

[9]  As previously noted, mother documented one visit in June 2020, five in July 2020, five in August 2020, four in September 2020, six in October 2020, five in November 2020, five in December 2020, four in January 2021, two in February 2021, three in March 2021, and two in April 2021.

## DISPOSITION

The orders terminating mother's and father's parental rights over P.E. and K.E. are affirmed.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.

MORI, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.